1
2
3
4
5           UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
6                   AT SEATTLE

7   CLAUDE BROWN,

8                   Plaintiff,

9       v.                                    C16-1340 TSZ

10  KING COUNTY,                              ORDER

11                  Defendant.

12          THIS MATTER comes before the Court on Defendant King County's Motion for

13  Summary Judgment, docket no. 32 (the "Motion").[1]  Having reviewed all papers filed in

14  support of, and in opposition to, the Motion, the Court enters the following order.

15  **Background**

16          This is an employment discrimination case alleging racial and disability

17  discrimination.  Plaintiff Claude Brown ("Plaintiff" or "Brown") seeks damages from his

18  employer, King County ("Defendant" or "King County") to redress a series of allegedly

19  unlawful employment practices.  King County moves for summary judgment on each of

20

21  [1] Plaintiff's Opposition to Defendant's Motion for Summary Judgment, docket no. 40, is referred to as the
    "Opposition."  Defendant King County's Reply in Support of Motion for Summary Judgment, docket no.
22  48, is referred to as the "Reply."  In the Opposition, Plaintiff concedes that his fourth claim for violation
    of the Age Discrimination in Employment Act ("ADEA") should be dismissed.  Opposition at 24.
23

Brown's seven (7) claims asserted in Plaintiff's First Amended Complaint, docket no. 16 (the "Complaint"): (1) racial discrimination under 42 U.S.C. § 1981; (2) retaliation under 42 U.S.C. § 1981; (3) discrimination under Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112(a) and 12112(b)(6); (4) violation of the Age Discrimination in Employment Act (ADEA); (5) retaliation in violation of Title VII of the Civil Rights Act of 1964; (6) racial discrimination under the Washington Law Against Discrimination (WLAD); and (7) retaliation under the WLAD.

**A. Brown's Race and Disabilities**

Brown is an African American who "was originally hired at Seattle Transit in 1972 as a Transit Operator." Declaration of Claude Brown in Opposition to Defendant's Motion for Summary Judgment, docket no. 43 ("Brown Declaration"), at ¶¶ 1, 3.[2] He is currently "a Light Rail Operator for the King County Department of Transportation Division Rail Section." Complaint at ¶ 7; Brown Declaration at ¶ 5.

Brown suffers from Chronic Obstructive Pulmonary Disease (COPD), chronic asthma, and chronic mobility issues. Brown Declaration at ¶¶ 28, 48. Brown began developing the symptoms underlying his COPD and chronic asthma in late 2012. *Id.* at ¶ 28.[3] Brown states that he is "physically disabled as a result of [his] ambulatory problems and [his] asthma or COPD." *Id.* at ¶ 63.

_____

[2] Excerpts from Brown's deposition transcripts are attached as Exhibit A to the Declaration of Erin Overbey ("Overbey Declaration"), docket no. 33, and referred to as "Brown Deposition."

[3] In 2007, Brown also had Spinal Stenosis surgery in an attempt to cure pain he had been having in his legs. Brown Declaration at ¶ 7. The surgery helped but did not fix the issue. *Id.*

**B. 2011–2012**

**a. Defendant's Three Refusals to Promote Brown to RSIT**

Brown attempted to obtain a promotion from Defendant on three different occasions in 2011 and 2012.  The first time was in 2011 when Brown applied for the Rail Supervisor in Training ("RSIT") position.  Brown Declaration at ¶¶ 13, 15.  Brown was informed that he was not qualified to test for the position.  *See id.* at ¶ 15.  Upon protest, Brown and several other minority employees were given "less than 24-hours [sic] notice to prepare for the [RSIT] exam."  *Id.*  Five of the employees wrote a letter to Transit Operations Manager Jim O'Rourke to protest the insufficient time they had been given to prepare for the exam.  *Id.*

Two Caucasians—Rail Operations Chief Terry Rhoads and Rail Operations Training Chief Amanda Nightingale—interviewed Brown for the RSIT position.  *Id.* at ¶ 13.  Brown states that Rhoads was impatient and ignored Brown during portions of the interview.  *Id.*  Defendant did not select Brown for the position and instead chose Hazel Henderson, a Caucasian employee who Brown contends "was unqualified . . . and . . . not properly trained . . . ."  *Id.* at ¶ 13.  Brown complained to the King County Office of Civil Rights that Defendant's selection process for the RSIT position discriminated against Brown by not giving him the opportunity to compete because of his race.  Brown Declaration at ¶ 14.

Brown states that Mr. Rhoads "has always interacted with [Brown] in a harsh and disrespectful manner[,]" including calling Brown a "packrat" and "spastic."  Brown Declaration at ¶ 16.  A fellow train operator for Sound Transit Link Light Rail submitted

a declaration in support of Brown's Opposition stating that, from 2008 through 2016, he "experienced repeated racial discrimination by . . . rail chief Terry Rhoads, who would question my former co-workers in an effort to find reasons to discipline me." Declaration of Frank King, docket no. 45 ("King Declaration"), at ¶ 2. Mr. King's declaration does not indicate that he witnessed Brown being discriminated against.

In April 2012, Brown again applied online for an RSIT position. Brown Declaration at ¶ 18. This time he was given a computer test, during which "a Caucasian female stood by [his] desk and watched [him] take the test and then physically stopped [him] from writing further and yelled 'time.'" *Id.* Brown could hear other people in the room still typing their answers. *Id.* Mr. Rhoads informed Brown that no one had passed the computer test and refused to show Brown his score. *Id.*

Brown then interviewed for the RSIT position. *Id.* at ¶ 19. "[T]he same Caucasian female that stopped [his] test asked [him] questions during the interview. She then left and did not stay to interview anyone else." *Id.* Mr. Rhoads informed Brown that she was "not needed for anyone else's interview." *Id.* Brown did not receive the RSIT position. *Id.* He finished fourth behind three Caucasian employees. *Id.* at ¶ 20. Only one of those three employees—Brian Matthews—"had equivalent qualifications to [Brown]." *Id.* at ¶ 21. Matthews resigned a few weeks later, but Brown was not selected to fill the position "despite being contractually next on the list." *Id.* at ¶ 22.

In October 2012, Brown again applied for the RSIT position. Brown Declaration at ¶ 29. "In December of 2012, [he] was informed that [he] was not selected to compete or interview for the position." *Id.* "Management declared that there were no qualified

candidates on the property and moved to open the recruitment to the outside . . . ." *Id.* at

¶ 30.  Brown complained to his union that Defendant was going outside of the

organization "to keep from having to hire qualified minorities for the RSIT positions."

*Id.* at ¶ 31.

### b.  Defendant's Selection Criteria

Defendant explains that Brown was not selected to participate in the next stage of

the RSIT position application in 2012 because he had scored lower than the other

candidates in areas including skills, knowledge, and education.  Nightingale Deposition at

68:9–69:21.[4]  The "Application Scoring Criteria for External Posting October 2012"

confirms that applicants were given weighted scores in on criteria including education,

lead experience, computer skills, and rail operations.  Exhibit D, Overbey Declaration.

Ultimately, Defendant selected three other applicants to fill the open RSIT positions—at

least two of whom were minorities.  *See* Brown Deposition at 233:10–13, 492:3–10,

494:19–495:15.

### C.  2013

### a.  Brown Files Complaint With KCOCR

On March 24, 2013, Defendant filed a complaint with the King County Office of

Civil Rights ("KCOCR") "after being passed over" for the RSIT position in 2011 and

2012.  Brown Declaration at ¶ 32.

---

[4] "Nightingale Deposition" refers to the excerpts from the deposition transcript of Amanda Nightingale attached as Exhibit C to the Overbey Declaration.

### b. Defendant Promotes Brown to—But then Removes Him From—the ATT Position

On June 28, 2013, Brown was appointed to an Acting Technical Trainer ("ATT") position. Brown Declaration at ¶ 34, Exhibit B. Brown received a memorandum explaining the details of the ATT assignment, stating among other things that the assignment was to continue "no later than 10/11/13" and "may be revoked at any time." *See* Brown Declaration, Exhibit D.[5] Brown began his ATT assignment on July 2, 2013, but was removed from the position ten days later on July 12, 2013, by Amanda Nightingale. *Id.* at ¶¶ 38, 44.[6] Within this ten day window, Brown states that Ms. Nightingale was "openly hostile" toward Brown, *see id.* at ¶ 40, and engaged in "efforts to demean" him. *See id.* at ¶¶ 41–43.[7] Upon removing Brown, Defendant filled the ATT assignment with Kevin Gumke. *See id.* at ¶ 45.

Ms. Nightingale testified during her deposition that she and another employee, Tom Jones, had discussed the possibility of splitting the ATT position between Brown and Mr. Gumke before giving the initial assignment to Brown. *See* Nightingale Deposition at 71:2–72:4.

### c. Brown Receives a Serious Infraction

On October 30, 2013, Brown received a Serious Infraction from Defendant "allegedly for failing to call Link Control Center prior to departing the Beacon Hill

---

[5] The memorandum is dated July 29, 2013—seventeen days after Brown's last day in the ATT position. *See also* Brown Declaration at ¶ 46.

[6] Ms. Nightingale informed Brown of his removal on July 10, 2013. *See id.* at ¶¶ 38, 44.

[7] Brown further states that Ms. Nightingale had never chosen an employee who was not Caucasian for the ATT detail, and she did not choose him for the position when he was appointed. *Id.* at ¶ 35. Instead, it was Tom Jones who appointed Brown to the position. *Id.* at ¶ 34.

Station." Brown Declaration at ¶ 47. Mr. Rhoads, who recommended and imposed a one-day suspension for the infraction, explains that

> Mr. Brown admitted that he violated a train order, which is defined in his union contract as a Serious Infraction. This was Mr. Brown's first Serious Infraction. The discipline I recommended was based entirely on Mr. Brown's admitted conduct and the union contract.

Declaration of Terry Rhoads in Support of King County's Motion for Summary Judgment, docket no. 39 ("Rhoads Declaration"), at ¶ 8.

### d. Brown Undergoes Hip Surgery

On December 3, 2013, Brown "underwent hip replacement surgery, after which [his] Physician required that [he] not work longer than three hours at a time." Brown Declaration at ¶ 48. When Rhoads scheduled Brown for an eight-hour shift and Brown reminded him of the physician's limitation, Rhoads "became angry and argued with [Brown]" about returning to work after surgery. *Id.*

### e. Brown Begins Receiving Minor Infractions

After the October 30, 2013, Serious Infraction and the December 3, 2013, hip surgery, Rhoads began issuing Brown Minor Infractions, including (1) not communicating with coworkers concerning his whereabouts; (2) arriving two minutes late from work after a random drug screening; (3) arriving late for a recertification class when Rhoads noticed Brown speaking to manager; and (4) an unexcused absence for leaving work because Brown was ill in violation of the sick leave policy—even though Brown was "in full compliance" with the policy. Brown Declaration at ¶ 49.

**D. 2014**

**a. Brown Files Another Complaint With KCOCR Alleging Retaliation**

On January 4, 2014, Brown filed a complaint with KCOCR alleging that
Defendant retaliated against his March 24, 2013, complaint by removing him from the
ATT position and imposing a one-day suspension due to his Serious Infraction. *See*
Exhibit L to the Declaration of Darryl Parker, docket no. 44 (Notice of Reasonable Cause
Finding). The KCOCR concluded that there was no reasonable cause to indicate that the
Serious Infraction and one-day suspension was retaliatory. However, it concluded that
"[t]he investigation finds sufficient evidence that there was a causal connection between
[Brown's] removal from the [ATT] assignment and his opposition to unfair practices."
*Id.* at 7. The KCOCR explained its finding as follows:

> The evidence shows that [Brown] was assigned to this acting position
> without limitation or notice that he would be removed from the position
> prior to the end of the assignment. [Defendant's] assertion that it intended
> to split the assignment is not supported by the evidence. . . . The
> investigation concludes that the assignment was later split in retaliation for
> [Brown] having raised issues of discrimination in the past and filing a prior
> complaint . . . ."

*Id.*

**b. Brown Applies for the RSIT Position One Last Time**

In May 2014, Brown once again applied for the RSIT position. Brown
Declaration at ¶ 50. On May 19, he was informed that his application was inadequate
because his materials "were incomplete and/or did not include all required information."
Brown Declaration, ¶ 51, Exhibit E. Brown maintains that he used the same application
he used each time he applied for the RSIT positions in the past, "which were never

questioned or denied before . . . ." *Id.* at ¶ 51. Only after a hearing was held did Brown learn that Defendant had rejected his application "for not including King County in the history and education section" of the application. *Id.* at ¶ 59.

### c. Defendant Imposes Additional Steps in Seeking Sick Leave

On June 16, 2014, Brown attended a doctor's appointment. Brown Declaration at ¶ 60. His physician filled out the paperwork for his FMLA protections. *Id.* Eight days later, Defendant insisted that Brown "sign paperwork before beginning [his] shift for the day." *Id.* at ¶ 61. The paperwork was a "Scheduled Medical Appointment" that Brown had submitted on June 14 for his June 16 appointment. *Id.* Defendant told Brown "to check the box stating, 'I do not have sufficient sick leave accruals to cover this absence.'" *Id.* Following his shift, Defendant "required [Brown] to obtain a signature from [his] Physician, to prove that [he] had gone to the June 16, 2014 appointment." *Id.* at ¶ 62.

### E. Access to Premises

Brown states that Defendant's "[m]anagement has displayed insensitivity and hostility towards those of us who are disabled, and mobility challenged." Brown Declaration at ¶ 64. Brown specifically asserts that he is required to take four flights of stairs in the building where he picks up his train to go to work—as "the elevator is regularly out of order." *Id.* at ¶¶ 64, 67. This, coupled with Defendant's refusal to allow Brown to park closer to where he accesses his train, has "made the job more difficult for [Brown] and other mobility challenged employees." *Id.* at ¶¶ 65–66. Brown blatantly states that "King County has not permitted me to use disabled parking spaces at the work

site." *Id.* at ¶ 67.  Likewise, Brown says that "the building's ADA buttons to assist with opening doors rarely work . . . ." *Id.* at ¶ 67.

Brown also has to call coworkers to bring down his essential work supplies to the building's first floor, which Brown describes as being "humiliating." *Id.* at ¶¶ 68, 71.  To date, Defendant has not fixed the elevator and has not been allowed to park closer to the building to accommodate his mobility issues.

**F.  EEOC Claims**

In the Complaint, Brown asserts that "[w]ithin the statutory time period, specifically on March 6, 2015, [he] filed a charge of discrimination with the Equal Opportunity Commission [("EEOC")] against defendant King County."  Complaint at ¶ 10.  The only evidence of an EEOC claim by Brown on March 6, 2015 is a Charge of Discrimination filed against Sound Transit (not King County).  *See* Exhibit J, Overbey Declaration.

In the March 6, 2015, Charge of Discrimination, Brown asserts that "[i]n May, 2014, I was denied the opportunity to test for a supervisory training program.  I have also been denied a reasonable accommodation for a disability." *Id.*  "The reason I was given for being denied the opportunity to test for a supervisory training program was that my application was not complete.  I believe the reason was discrimination due to my race." *Id.*

On November 8, 2015, Brown filed an EEOC claim against King County.  *See* Exhibit A to the Declaration of Candy Arata, docket no. 34 ("Arata Declaration").  In this Charge of Discrimination, Brown asserts identical claims to those he lodged against

Sound Transit: "In May, 2014, I was denied the opportunity to test for a supervisory training program. I have also been denied a reasonable accommodation for disability." *Id.* He further confirms that the latest date on which any discrimination occurred was December 8, 2014. *See id.*

On September 28, 2016, the EEOC issued a Dismissal and Notice of Rights. Exhibit C to Arata Declaration.

**Discussion**

**A. Summary Judgment Standard**

The Court should grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While "all justifiable inferences" are to be drawn in favor of the non-moving party, *id.* at 255, when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

**B. Statute of Limitations**

**1. Third, Fourth, and Fifth Claims (ADA, ADEA, and Title VII)**

Brown's claims under the ADA, ADEA, and Title VII are all time-barred. "Under the ADA, the ADEA, and Title VII, 'a claimant may bring suit in federal court only if she

has filed a timely complaint with the EEOC and obtained a right-to-sue letter.'" *Hanson v. Boeing Co.*, No. C14 –1326 TSZ, 2015 WL 6449312, at *3 (W.D. Wash. Oct. 23, 2015) (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001); *Douglas v. Cal. Dept. of Youth Auth.*, 271 F.3d 812, 823 n.12 (9th Cir. 2001)). "Complaints are timely if they are filed within 300 days of the alleged unlawful employment practice." *Id.* (citing 29 U.S.C. § 626(d) (ADEA); 42 U.S.C. § 2000e–5(e) (Title VII); 42 U.S.C. § 12117(a) (ADA)).

Brown did not file his EEOC claim against King County until November 8, 2015. *See* Exhibit A to Arata Declaration. As he states in his claim, the last instance of discrimination occurred on December 8, 2014. Thus, a minimum of 335 days elapsed between the time Brown filed his EEOC complaint against King County and the time of the alleged unlawful employment practice. Brown's claims premised on alleged violations of the ADA, ADEA, and Title VII are therefore time-barred.[8]

## 2. First, Second, Sixth, and Seventh Claims (§ 1981 and WLAD)

Brown brings his remaining claims under 42 U.S.C. § 1981 and the WLAD. The statute of limitations for claims brought under the WLAD is three years. *Jones v. King County Metro Transit*, No. C07–319Z, 2008 WL 2705138, at *10 (W.D. Wash. July 9, 2008) (citing *Antonius v. King County*, 153 Wn.2d 256, 261–62 (2004); RCW 4.16.080(2)). This limitations period is tolled during the sixty-day period of mandatory

---

[8] Brown does not address this issue in his Opposition. To the extent Brown's EEOC complaint can be construed as an amendment to his earlier EEOC complaint against Sound Transit—which was filed within the statutory timeframe—these claims are still time-barred. *See Percy v. New York*, 264 F. Supp. 3d 574, 589 (S.D.N.Y. 2017) (citing *Fuchilla v. Prockop*, 682 F. Supp. 247, 256 (D. N.J. 1987)).

presentation to a governmental entity. *Id.* (citing RCW 4.96.020(4)). Brown filed his

initial complaint in this action in King County Superior Court on July 25, 2016. *See*

docket no. 1-1. He submitted a tort claim form to King County on May 24, 2016, tolling

his WLAD claims by 60 days. *Id.* at ¶ 25. Thus, the Court will only consider alleged

misconduct dating back to May 26, 2013.[9]

The statute of limitations for claims brought under 42 U.S.C. § 1981 is four years.

*Jones*, 2008 WL 2705138, at *10 (citing *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S.

369 (2004); 28 U.S.C. § 1658). The relevant date for Brown's 42 U.S.C. § 1981 claims is

therefore July 25, 2012.

**C. Analysis**

    **1. Discrimination**

42 U.S.C. § 1981 and the WLAD protect employees from discrimination on the

basis of race. *Miller v. Boys & Girls Clubs of Snohomish Cty.*, No. C15–2027–JCC, 2017

WL 897811, at *5 (W.D. Wash. Mar. 7, 2017). The parties agree that the *McDonnell*

*Douglas Corp. v. Green* burden-shifting framework should apply in assessing Brown's

discrimination claims here. 411 U.S. 792, 802 (1973).

Under *McDonnell Douglas*, a plaintiff must first establish the prima facie case that

(1) he is a member of a protected class; (2) he was treated less favorably than an

employee outside his protected class in the terms and conditions of his employment; and

(3) the employee outside his protected class was similarly situated and doing substantially

the same work. *Id.* at 802. "Establishing the prima facie case is a minimal burden, and

---

[9] Brown does not allege a continuing violation.

ORDER - 13

does not rise to the level of the preponderance of the evidence standard." *Miller*, 2008 WL 897811 at *5. Second, if the plaintiff has proven a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its "true" reasons, and instead were "pretext" for discrimination. *Id.* at 804.

It is undisputed that Brown is a member of a protected class as an African American.[10] At issue is whether Brown can prove that he was treated less favorably than an employee outside of his protected class. Brown points to five different instances in which Defendant allegedly discriminated against him: (1) refusal to promote him to the RSIT position in October 2012 (Opposition at 17–18); (2) Brown's demotion from the ATT position in July 2013 (*id.* at 18–21); (3) issuing a Serious Infraction (*id.* at 21); (4) refusal to promote Brown to the RSIT position in 2014 (*id.* at 22–23); and (5) imposing additional conditions on Brown in obtaining sick leave (*id.* at 11–12).[11] *See* Complaint at ¶¶ 45, 67–69.

The evidence does not show that, in any of these five instances, Brown was treated less favorably than any other similarly situated employee. First, while Brown asserts his

---

[10] The parties do not appear to dispute that, for the relevant time periods in question, Brown performed his job satisfactorily. The Court therefore assumes, without deciding, that Brown has established his satisfactory performance, that he was qualified, and that he met Defendant's legitimate expectations.

[11] Brown also alleges that he was discriminated against when Defendant refused to promote him to the RSIT position in April 2012. *See* Opposition at 15–17. That incident, and the allegations predating that incident, are time-barred under the statutes of limitation described above.

belief that Defendant sought to prevent qualified minorities from obtaining the RSIT

position (*see* Brown Declaration at ¶¶ 30–31), he has not provided any evidence or

argument that Defendant treated him less favorably than any other employee. *See*

Opposition at 17–18. In contrast, Brown admitted in his deposition that at least two of

the three successful applicants for the 2012 RSIT position were minorities. *See* Brown

Dep. at 233:10–13, 492:3–10, 494:19–495:15.[12]

Second, Brown has not submitted any evidence that he was treated differently than

any non-protected employee when Defendant removed him from the ATT position.

Defendant received two applications for the ATT position—one from Brown and one

from Mr. Gumke—and decided to split the temporary position between the two

employees. *See* Nightingale Deposition at 71:2–72:4. Both Brown and Mr. Gumke split

the ATT position and then returned to the roles they held prior to the temporary

assignment. *See id.* at 95:19–96:5. The mere fact that Mr. Gumke held this temporary

role longer than Brown is insufficient to establish that Defendant treated him less

favorably than Gumke. Brown testified that his compensation went down when he

assumed the temporary ATT position. Brown Dep. at 269:9–270:24. Thus, by working

less days in the ATT role, he was paid more than Gumke was. Moreover, while Brown

states that the "real value" of the position was "the chance to learn more about the Rail

system and the opportunity to help others[,]" Brown Declaration at ¶ 36, he presents no

evidence that he was deprived of these opportunities by only assuming the ATT role for

---

[12] Contrary to Defendant's assertion, Brown does not recall whether the third successful application, Jeff Wachtel, is either white or Native American. *See* Brown Dep. at 492:8–10.

eight days.  Thus, the facts underpinning this incident are insufficient to establish this element of Defendant's prima facie discrimination claim.

Third, Brown does not establish that Defendant treated him any less favorably by imposing a Serious Infraction.  Brown states that "[t]here was no basis for the issuance of the Serious Infraction, because the incident was caused by the negligence of LCC to follow Standard Operating Procedures."  Brown Declaration at ¶ 47.  This statement is inconsistent with the testimony Brown gave at his deposition, in which Brown admitted that his conduct amounted to a Serious Infraction.  *See* Brown Deposition at 442:22–443:7.  Brown further testified that a one-day suspension is appropriate for a Serious Infraction.  *Id.* at 295:24–296:1, 444:8–23.

While Brown states his "concern is the equal application of the . . . discipline policies[,]" *id.* at 443:11–12, the evidence shows Defendant has imposed a one-day suspension policy for serious infractions consistently across the board.  *See* Rhoads Declaration at ¶¶ 4–6, Exhibits A–C; Rhoads Dep. at 58:7–10, 61:2–62:17.[13]  No evidence suggests that Defendant failed to consistently apply this policy to both protected class members and non-protected class members, and the Serious Infraction and suspension are not sufficient to establish this element of Brown's prima facie discrimination claim.  *See McDaniels v. Grp. Health Co-op.*, 57 F. Supp. 3d 1300, 1312 (W.D. Wash. 2014) (Robart, J.) (to raise an inference of disparate impact, "the plaintiff must be able to point to either (a) one or more valid comparators, or (b) other

---

[13] "Rhoads Dep." refers to the excerpts from the Deposition of Terry Rhoads attached as Exhibit E to the Overbey Declaration, docket no. 33.

circumstances surrounding the adverse action that create an inference of discrimination.").

Fourth, Brown has not established that he was treated differently when Defendant denied his 2014 RSIT application because it was incomplete. Defendant's Human Resources representative responsible for fielding applications confirmed that she disqualified *all* applicants who failed to include the requisite information in their applications. *See* Declaration of Ivette-Martinez-Morales, docket no. 37, at ¶¶ 4–6.[14] Without more, this incident is insufficient to establish the disparate impact element of Brown's prima facie discrimination claim.

Fifth, Brown has not proven his allegation that Defendant imposed extra procedural requirements on Brown for him to take sick leave. Brown asserts that his supervisor, David Vestal required Brown to obtain a signature from his physician to prove that Brown had gone to a doctor's appointment. *See* Brown Declaration at ¶¶ 60–62. Defendant's standard Scheduled Medical Appointment form, which Brown relied on in seeking leave for his absence to attend the appointment, required a "Licensed Practitioner signature" verifying that the "individual attended the appointment." Exhibit H, Overbey Declaration. Brown testified that his doctor faxed over the signature, and

---

[14] Brown attempts to create an issue of fact by arguing Ms. Martinez-Morales did not give Brown an explanation for why his application was being rejected. But the deposition testimony Brown cites, along with the actual email exchange between Ms. Martinez-Morales and Brown, unequivocally show that Ms. Morales-Martinez was out of the office sick when Mr. Brown was attempting to contact her regarding the denial of his application. *See* excerpts from the transcript of the Deposition of Ivette Martinez-Moralez, attached as Exhibit G to the Declaration of Darryl Parker, docket no. 44, at 58:3–25; Brown Declaration, Exhibit G.

Mr. Vestal never bothered Brown about it again.  *See* Brown Deposition at 452:14–17, 452:2–25.  These facts do not establish this element of Brown's discrimination claim.

In sum, Defendant has shown an absence of any genuine material fact that its treatment of Brown was no less favorable than its treatment of any other employee, including employees outside of Brown's protected class.[15]  With the evidence presented, and drawing all reasonable inferences in Brown's favor, no reasonable juror would conclude that Brown can satisfy this prong of his prima facie claim under the *McDonnell Douglas* paradigm.  His discrimination claims under 42 U.S.C. § 1981 and the WLAD should be dismissed.

### 2.  Retaliation

To establish retaliation under both 42 U.S.C. § 1981 and the WLAD, Brown must prove that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) the protected activity is causally connected to the adverse employment action.  *Miller*, 2017 WL 897811 at *8 (citing *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir. 1986); *Lodis v. Corbis Holdings, Inc.*, 172 Wn. App. 835 (2013)).  Adverse actions "are actions by an employer that are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.*

Only after a claimant establishes these three prima facie elements does the burden of production shift to the defendant to articulate a legitimate, nondiscriminatory reason

---

[15] Brown also argues that Defendant failed to accommodate Brown's medical condition.  *See* Opposition at 23–24.  Brown only raises this theory under his ADA claim which is time-barred.  *See* Complaint at ¶¶ 49–51.

for the adverse employment decision. *Id.* (quoting *Ruggles*, 797 F.2d at 786). If defendant is successful, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons are pretexts for retaliation or that a discriminatory reason more likely motivated the defendant's actions. *Id.*

Here, Brown argues that after filing his complaint with the KCOCR on March 24, 2013, Defendant subjected him to retaliatory behavior. Opposition at 6 (citing Brown Declaration at ¶ 32).[16] Thus, the Court only considers those instances occurring after March 24, 2013, in assessing Brown's retaliation allegations.

The most significant issue plaguing Brown's retaliation theory is his inability to demonstrate a causal link between the incidents in question and any discriminatory animus. The causation element requires Brown to show by a preponderance of the evidence that (1) engaging in the protected activity was one of the reasons for the adverse employment action; and (2) that "but for" such activity plaintiff would not have been fired. *Ruggles*, 797 F.2d at 785.

Brown has not shown that the March 24, 2013 complaint was a reason Defendant decided to remove Brown from the ATT position. Insofar as this removal can be

---

[16] Brown also identifies the following informal complaints in his declaration: (1) he "organized, but never filed an official complaint" alleging discrimination sometime before 1981, *see* Brown Declaration at ¶ 3; (2) he complained to the Office of Civil Rights "[s]ometime in 2011" that the RSIT selection process discriminated against him, *id.* at ¶ 14; and (3) in late 2011, his shop steward held a meeting with Brown and Rhoads to resolve issues relating to Rhoads' treatment of Brown, *id.* at ¶¶ 16–17. None of these events fall within the applicable statute of limitations, and Brown does not present any evidence demonstrating that Defendant engaged in any improper conduct within the limitations period that was in retaliation for—and causally connected to—any of these informal complaints or other protected conduct.

classified an adverse employment action,[17] the evidence does not show that the March 24, 2013 complaint—or any other protected activity—caused Defendant's decision to split the ATT position and replace Brown with Mr. Gumke.[18] Unlike the evidence contemplated by the KCOCR in finding reasonable cause that this decision was in retaliation to the March 24, 2013 complaint, the evidence before the Court demonstrates that Ms. Nightingale and her coworker, Mr. Jones, had contemplated splitting the position prior to Brown's appointment, but did not solidify their decision (or inform Mr. Brown or Mr. Gumke of their decision) until Brown had already assumed the ATT position. While perhaps disorderly, this conduct does not create an issue of fact that this conduct was in retaliation to any protected activity.

Brown has likewise failed to present any cognizable evidence causally connecting any protected activity to the remaining incidents he alleges were retaliatory. He agrees that his conduct amounted to a serious infraction warranting a one-day suspension.

_____

[17] Defendant cites to an Eleventh Circuit opinion holding that, absent "materially adverse consequences," removal from a temporary position is not an adverse action for purposes of establishing a retaliation claim. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001). The evidence here shows that Brown received higher compensation when he returned to his normal role after being removed from the ATT position. While Brown asserts that "[t]he real value of this position was not in higher wages, but in the chance to learn more about the Rail system and the opportunity to help others[,]" Brown Declaration at ¶ 36, he does not present facts that he did not obtain this value during the eight days he served in the ATT role. *Davis* is instructive on this point and suggests that the promotion and demotion to and from the ATT role is not an actionable adverse employment action to begin with.

[18] Brown attempts to rebut the "same actor" inference raised in the Motion at page 21 by stating that Ms. Nightingale "did not choose me for the position when I was appointed." Brown Declaration at ¶ 35. This is insufficient to create a material issue of fact—it makes no difference whether Ms. Nightingale was the same actor. If she *was* the same actor, there is no evidence that she learned about the complaint between the time she promoted and demoted Brown. This is important, because Brown seems to suggest that the decision to "split" was made after Brown had already been given the position and Defendant had notified Mr. Gumke that he had *not* been selected for the position. Conversely, if she *wasn't* the same actor who promoted and then demoted Brown, there is no evidence that any protected conduct was a reason that *either* Mr. Jones or Mr. Nightingale considered in choosing to remove Brown from the position.

ORDER - 20

Likewise, the evidence shows the absence of any genuine issue of material fact as to whether Brown was subjected to the same procedural requirements in obtaining leave to attend a doctor's appointment.

In sum, Brown has failed to raise any genuine issue of material fact concerning Defendant's request for summary judgment on Brown's retaliation claims. The Motion is granted and those claims are dismissed with prejudice.

**Conclusion**

For the foregoing reasons, the Motion is GRANTED and Brown's claims against Defendant are DISMISSED with prejudice. [19]

IT IS SO ORDERED.

Dated this 15th day of February, 2018.

Thomas S. Zilly
United States District Judge

---

[19] In its Reply, Defendant moves to strike inadmissible portions of the declarations filed in opposition to the Motion. The motion to strike is STRICKEN as moot.